Argued September 6, affirmed November 21, 1951

GOOCH ET AL. *v.* ROGERS ET AL.
238 P. 2d 275

*John D. Galey* argued the cause for appellants. On the brief were Galey and Galey, of Sweet Home.

*Melvin Goode,* of Albany, formerly District Attorney for Linn County, argued the cause and filed a brief for respondents.

ROSSMAN, J.

This is an appeal by the plaintiffs, owners of a tract of reforestation land, from a declaratory judgment which held that the penalty provision of § 107-125, O.C.L.A., is valid, and that the court had no power to relieve the plaintiffs from a penalty which was imposed upon them in the latter part of 1948 under that section of our laws.

The plaintiffs contend that the circuit court erred (1) "in not declaring the penalty provision of O.C.L.A. 107-125 unconstitutional and void", and (2) "in failing to waive and remit the penalty."

Section 107-125, O.C.L.A., was § 10 of Oregon Laws 1929, ch. 138. Since amendments which were made to that act after 1948 are not applicable to the penalty which was assessed in that year against the plaintiffs, we shall omit mention of them from the summary of the act which we shall now make.

The act, as set forth in our compiled laws, consists of twenty sections (§§ 107-101 to and including 107-143, O.C.L.A.). The first section states:

"The purposes of this act are:

1. To encourage the growth and protection of forest crops on lands chiefly valuable therefor.

2. To provide a fair, stable, continuous tax revenue from such lands."

Subsequent sections authorize the board of forestry, the tax commission and the county assessors to pursue the course of which we shall now take notice. Section 107-111, as amended by Oregon Laws 1943, ch. 143, § 2, empowers the tax commission, upon recommenda-

tion of the board of forestry, to classify appropriate land within the state as "reforestation lands" which, as defined in § 107-102 as amended by Oregon Laws 1943, ch. 143, § 1, are "lands suitable chiefly for forest crop production." When a tract of land has been classified as reforestation lands, it is removed by the local assessor on the following March 1 "from the list of properties assessed and taxed under the ad valorem property tax" (§ 107-122) and at that time the assessor enters it upon a separate roll whereby it becomes subject to an "annual forest fee" and eventually to a "yield tax" (§ 107-121, as amended by Oregon Laws 1943, ch. 143, § 3). Seemingly, to render it clear that reforestation lands shall not pay any taxes except the two just mentioned, § 107-129 says:

"Any land and forest crop taxed under the provisions of this act shall not be otherwise assessed and taxed under the laws of this state; * * *."

The "forest fee" is an annual charge of "5 cents per acre on lands west of the summit of the Cascade mountains and 2½ cents per acre on lands east of the summit" (§ 107-121, as amended by Oregon Laws 1943, ch. 143, § 3). The plaintiffs' land lies west of the summit of the Cascade Range.

The yield tax becomes payable after the "forest crops" have been harvested, and its amount is 12.5 per cent of the value of the crop as estimated by the forestry board (§ 107-123). In view of the fact that there is no issue concerning the amount of the yield tax which was assessed against the plaintiffs' lands, we shall not mention the manner in which the amount of that tax is computed.

Owners of reforestation land are prohibited by the act from cutting its timber without first obtaining a

written permit from the forestry board. The exact words of the act (§ 107-124, O.C.L.A.) are:

"It shall be unlawful for any person to harvest or cause to be harvested any forest crop, or to remove or cause to be removed any forest growth, from privately owned lands which have theretofore been classified as reforestation lands, without first having obtained a written permit so to do from the board, which said permit shall set forth the unit value, by units of proper measurement, of the respective kinds of forest crops on said premises; said unit value to be determined by the board, from all evidence it commands, to be the true unit market value of such respective products, immediately prior to harvesting."

The section provides for a hearing before the forestry board if the owner is dissatisfied with the values fixed by it and for an appeal to the circuit court from the action taken by the board.

Section 107-123 requires owners who, pursuant to the required permit, cut their timber "to keep an exact record of the number and kind of units of all forest products harvested." It also renders it the duty of the owner "within 15 days after the thirtieth day of June and within 15 days after the thirty-first day of December of each year to report, under oath, to said board and to the tax collector of the county wherein the lands are situated the number and kinds of units of all forest products harvested from such lands during the preceding six months." Finally, the section provides that "the report to the said tax collector shall be accompanied by the owner's remittance, in legal tender, of the yield tax due hereunder."

The foregoing sketches the manner in which reforestation lands are removed from the regular tax roll and placed upon a separate roll whereby they

become liable for nothing more than the "forest fee" until they have subjected themselves to the "yield tax".

We now come to the section (107-125) which is the subject matter of this controversy. Its pertinent part follows:

> "Any person or owner harvesting forest crops from lands which have theretofore been classified as reforestation lands who shall have failed first to obtain a permit from the board, or shall have failed to make his remittance of yield taxes due hereunder within said 15-day period, shall be subject to a penalty of an additional yield tax of 10 per cent of the fixed value of said products, and the amount of such yield tax shall be a first lien against the said forest crops and a debt due and owing to the county from the owner of said lands at the time said forest crops are harvested, and the tax collector of the county wherein such lands are situated shall, in addition to the remedies provided by statute for the collection of taxes against real and personal property, maintain an action against such owner for the collection thereof with the aforesaid penalty and with interest thereon from said 15-day period at the rate of 10 per cent per annum until paid; * * *."

It will be observed that the 10 per cent provision is applicable only to the yield tax, and not to the forest fee. Although the section says that delinquent owners "shall be subject to a penalty", it terms the appended amount an "additional yield tax". Next, the section, through the use of the term "such yield tax", refers to the combined sums and renders their total "a first lien against the said forest crops" and a personal debt of the owner. Evidently the legislature wished the appended amount to partake of the two-fold character of a penalty and a tax.

Some of the other sections of the act provide: All lands not classified as reforestation lands shall remain subject to the ad valorem property tax laws (107-127); classification is not final, and the agencies aforementioned may for cause re-classify (107-112, as amended by Oregon Laws 1945, ch. 63, § 1); all forest fees and yield taxes shall be deposited by the tax collecting officer with the county treasurer in the same manner as all other taxes (107-128, as amended by Oregon Laws 1943, ch. 143, § 4); any person who knowingly makes a false return shall be deemed guilty of a misdemeanor and shall receive the penalty which the act prescribes (107-142); any person "shall, upon request, be granted a hearing before the board on any subject pertaining to the activities of said board under this act affecting his or their properties or interests as a taxpayer. * * * An appeal from any decision of the board or commission under this act may be taken * * * to the circuit court" (107-143); and any person who harvests "forest products from reforestation lands * * * without first having obtained a permit in writing so to do" is subject to fine and penalty (107-126).

We see from the foregoing that the act undertakes to achieve the purposes announced in § 107-101 by encouraging owners of reforestation lands, through favorable tax treatment, to grow new forests upon their property. Evidently the modest forest fee, which is all that the owner of reforestation lands pays until his trees have reached maturity, is intended to stimulate reforestation and thus promote the welfare of the state. Presumably, when the timber has been felled, the owner is in a better financial condition to contribute to the cost of government his fair share and, accordingly, at that time the yield tax exacts of him

an amount which possibly is intended to bridge the gap between the forest fee and the amount which he would have paid had his property remained on the tax roll. In order to prevent arbitrary and unwarranted action, the act makes ample provision for agency review and for appeals to the courts.

Pursuant to the provisions of the act which we have reviewed, the property owned by the plaintiffs was classified as reforestation lands and, later, upon their application, the plaintiffs were granted the permit which § 107-124 requires of those who wish to cut timber. Between January 1, 1948, and June 30, 1948, the plaintiffs removed 766,598 board feet of Douglas fir saw logs of a value, as determined by the forestry board, of $4,599.39. Based upon that valuation, the yield tax of 12.5 per cent was $574.95. The plaintiffs make no contention that any error is present in any of those figures.

By reverting to § 107-123, it will be observed that the yield tax should have been paid "within 15 days after the thirtieth day of June," 1948, but the plaintiffs did not pay it until September 21, 1948. As a result of their delinquency, the plaintiffs were met with the additional tax, or penalty, of $459.96.

The plaintiffs' brief summarizes as follows the bases upon which they seek relief:

"(a) The penalty should be waived because of the alleged mistake, inadvertence, and excusable neglect, and because it is an excessive penalty for the offense for which it is levied in this instance.

"(b) The penalty is unconstitutional and void because it is grossly disproportionate for the offense so penalized, since it is a penalty equal to 80% of the tax."

The "mistake, inadvertence, and excusable neglect" mentioned in the preceding paragraph is averred in the complaint, as follows:

"At all times herein mentioned, the bookkeeping and office work of Lucky Four Logging Company was entirely entrusted to Mrs. Marjorie Johnson, the wife of the plaintiff John V. Johnson, who at all times herein mentioned was the only individual immediately familiar with the files, records and office work of the partnership. On or about July 10, 1948 the plaintiff John V. Johnson and his said wife left Oregon on an extended automobile tour of eastern states and did not return to Linn County, Oregon until or about August 20th, 1948. During that period of time, the only member or office employee of the partnership who was in Linn County, Oregon, was the plaintiff Fred Gooch Jr. During all of the time between June 30th, 1948 and the time that said report and payment were made, or immediately prior thereto, neither of the plaintiffs was aware that said report and payment had not been made within 15 days after June 30, 1948."

Lucky Four Logging Company is the assumed name of a partnership which consists of the two plaintiffs.

Based upon contentions that the penalty exacted by the act "is grossly disproportionate for the offense so penalized", the plaintiffs argue that the act's penalty provision is invalid. They depend upon the due process clause of the United States Constitution (U. S. Const. Amend. XIV, § 1), the equal protection clauses of the United States and Oregon Constitutions (U. S. Const. Amend. XIV, § 1 and Or. Const. Art. I, § 20), and the excessive fines provisions of the United States and Oregon Constitutions (U. S. Const. Amend. VIII and Or. Const. Art. I, § 16).

We believe that the application of all of those constitutional provisions to the issues before us can be determined together. The plaintiffs cite *In re Deming's Guardianship*, 192 Wash. 190, 73 P. 2d 764; *Superior Laundry Co. v. Rose*, 193 Ind. 138, 137 N.E. 761, 26 A.L.R. 1392; *Chicago & Northwestern Railway Co. v. Nye Schneider Fowler Co.*, 260 U.S. 35, 67 L. Ed. 115 43 S.Ct. 55; *Missouri Pacific Railway Co. v. Tucker*, 230 U.S. 340, 57 L.Ed. 1507, 33 S.Ct. 961; *Edwards & Browne Coal Co. v. City of Sioux City*, 213 Ia. 1027, 240 N.W. 711; *State v. Crawford*, 74 Wash. 248, 133 P. 590, 46 L.R.A. (N.S.) 1039, and annotation 46 L.R.A. (N.S.) 1039.

The Deming decision held invalid a Washington statute which provided that any guardian, who failed biennially to file a written verified account of his receipts and disbursements, should be awarded no allowances for his services and should be liable to his ward for a penalty equal to ten per cent of the value of the whole estate. The court pointed out that no Washington legislation imposed a similar penalty upon one who stole his ward's property, neglected his ward to an extent whereby the latter suffered physical injury or committed, at his ward's expense, some other offense. The court emphasized the fact that the Washington legislature borrowed the attacked statute from Indiana, but that in so doing it omitted to adopt a companion Indiana act which subjected a guardian who converted his ward's property to his own use to a penalty. In contrast to the Washington situation, it deemed the Indiana legislation "well balanced." Referring to the Washington statute, the court said: "The section is apparently based upon some theory of compensation for damages" but expressed the belief that wards seldom suffer damage from failure of guardians

to file verified reports. It deemed the failure to file biennially a verified account a "comparatively minor dereliction." Continuing, the court said:

"Manifestly, the ten per cent is a penalty and not a compensation. * * * Its imposition does not depend upon the existence of any damage whatsoever. A penalty may be so excessive as to amount to a deprivation of property without due process of law. * * * We cannot but conclude that the statute in question makes mandatory so severe a penalty for what will often amount to no more than a trivial departure from a guardian's statutory duties, resulting in no damage to his ward, as to amount to deprivation of property without due process of law.

* * *

"Careful consideration of the statute now under consideration, in the light of the authorities, convinces us that the provision thereof purporting to impose a ten per cent penalty for failure to file a verified account within the time limited by law is arbitrary, unjust and discriminatory is not based upon any reasonable theory of compensation, and that the same is consequently void as amounting to taking property without due process of law."

Three members of the court dissented.

The Superior Laundry Company decision held invalid an Indiana statute which provided that any employer who failed to pay wages to his workmen semi-monthly "shall as liquidated damages for such failure pay to such employee for each day that the amount due to him remains unpaid ten (10) per cent of the amount due to him in addition thereto", together with an attorney fee. The court pointed out that if an employee demanded wages which the employer denied owing, or claimed to have paid, the statute doubled the debt for each ten-day period consumed in negoti-

ation or litigation, and, also, that if a workman demanded more than was due, that fact would not prevent the actual debt from doubling. In holding the statute invalid, the court said:

"The penalty is not proportioned to the amount of wages withheld, but is without limit as to the time during which it shall continue to accumulate, or as to the total amount. This is not 'equal protection of the law,' nor does it afford the employer 'due process of law,' but arbitrarily deprives him of property by threatening such dire consequences, if he shall litigate a claim for wages and not be entirely successful, that he may fear to refuse a demand, even though convinced that it is unfounded and unjust * * *."

The court quoted with approval the following from *Ex parte Young,* 209 U.S. 123, 52 L.Ed. 714, 28 S.Ct. 441, 13 L.R.A. (N.S.) 932, 14 Ann. Cas. 764:

"* * * when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law, in terms, prohibited the company from seeking judicial construction of laws which deeply affect its rights."

The Chicago & Northwestern Railway Company case arose out of a Nebraska statute which provided that a common carrier which did not settle a claim for damages arising out of freight shipments within a prescribed number of days, or which tendered an amount smaller than that subsequently recovered, must suffer the award of seven per cent interest as a penalty and the recovery by the claimant of a reasonable amount as an attorney fee. The act also authorized the award to the plaintiff of an additional attorney fee in the event of an appeal. In the case before the

court, the plaintiff sued for $2,097.21, together with $900 attorney fee. The jury returned a verdict of $802.27 with seven per cent interest, and the court, on motion, awarded $600 as an attorney fee. The Supreme Court of Nebraska required a remittitur of $209.01, to which the plaintiff consented, and then reduced the attorney fee to $200, but allowed a fee of $100 to the plaintiff for services in that court. The Federal Supreme Court, in considering the validity of the statute, took note of the fact that *Atchison, Topeka & Santa Fe R. R. Co. v. Matthews*, 174 U.S. 96, held valid a statute which provided for the recovery against railroads of an attorney fee in actions based upon charges for fire damage caused by the negligent operation of railroads. It also took note of *Seaboard Airline Railway v. Seegers*, 207 U.S. 73, in which the court held valid a statute which imposed a penalty of $50 on common carriers for failure to adjust claims within forty days if, in subsequent litigation, the plaintiff recovered the full amount of his claim. Further, it reviewed *St. Louis Iron Mountain & Southern Railway Co. v. Wynne*, 224 U.S. 354, and *Kansas City Southern Railway Co. v. Anderson*, 233 U.S. 325, both of which were concerned with a statute which required railroad companies to pay, within thirty days after notice, claims for livestock killed or injured, or suffer a penalty of double damages and the recovery of an attorney fee if the claimant recovered the amount for which he prayed. In the Wynne case, the plaintiff, after presenting a claim for $500, on its rejection sued for $400 and recovered judgment in that amount. In the Anderson case, the plaintiff had not demanded more than the amount for which he recovered judgment. In the Wynne case, the court held that, since the plaintiff had demanded more than the amount re-

covered, the award of double damages and an attorney fee constituted an arbitrary exercise of power and the deprivation of property without due process of law. In the Anderson case, the court sustained the validity of the statute and of the recovery. We shall refrain from mentioning other decisions which the court reviewed. It held that they indicated that reasonable penalties, including attorney fees, may be imposed upon carriers to induce them to make seasonable payment of just claims presented to them arising out of faulty performance of their functions. It expressed the belief that its opinions followed "the general rule that when, in their actual operation in the cases before it, such statutes work an arbitrary, unequal and oppressive result for the carrier which shocks the sense of fairness the Fourteenth Amendment was intended to satisfy in respect of state legislation, they will not be sustained." The court declared the act valid, but held that the award of $100 as an attorney fee for services rendered by the plaintiff's attorneys in the Supreme Court of Nebraska, where the carrier succeeded in having the judgment reduced, was not "fair play". It pointed out:

> "Penalties imposed on one party for the privilege of appeal to the courts, deterring him from vindication of his rights, have been held invalid under the Fourteenth Amendment. Missouri Pacific Ry. Co. v. Tucker, 230 U.S. 340."

Apart from striking out the $100 fee, the attacked judgment was sustained. The fourth decision upon which the plaintiffs rely is *Missouri Pacific Railway Co. v. Tucker*, which was concerned with the validity of a Kansas statute that prescribed maximum rates which carriers could charge for the transportation of oil and gasoline in Kansas. The act provided that

every carrier "which shall demand, exact or receive for such transportation or delivery any sum in excess of the rates hereby made lawful shall be liable to any person injured thereby in the sum of $500 as liquidated damages", together with an attorney fee. The plaintiff who shipped some oil was charged $3.02 in excess of the legislative prescribed rate and thereafter, in an action against the carrier, recovered the statutory sum of $500. The decision declared that the Kansas act, as construed by the courts of that state, afforded the carrier no opportunity for securing a judicial determination of the validity of the rates except by way of defense in a civil or criminal action brought against it. In holding the act invalid, the court said:

"It will be perceived that this liability is not proportioned to the actual damages. It is not as if double or treble damages were allowed, as often is done, and as we think properly could have been done here. Nor is it as if there would be difficulty in proving or ascertaining the actual damages, thereby furnishing a reason for prescribing a liquidated amount reasonably approximating the probable damages, taking one case with another. * * * It may, therefore, be said that when the penalties for disobedience are so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights."

In the Edwards & Browne Coal Company case, the court held unconstitutional a municipal ordinance which, in vague language, regulated the keeping for sale of inflammable oils, and which provided:

"Any person violating or failing to comply with any of the provisions of this ordinance, shall upon conviction, be fined in any sum not exceeding

$100.00 or imprisoned for a term not exceeding thirty days; and each day that any person shall continue to violate or fail to comply with any of the provisions of this ordinance, shall be considered a separate offense."

The court, in holding that provision invalid, reviewed sections of the ordinance with which owners were compelled to comply, and found that they were so "vague and indefinite" that "the owner may not know for many days, weeks or even months that he is violating the ordinance." After declaring that "there is no yardstick by which his conduct is to be measured", it added: "But if the officer finally concludes that a violation has existed, the owner may be prosecuted as for a separate and distinct offense, for each day of this period." In holding the ordinance invalid, the court employed the principle which we quoted from the Ex parte Young decision.

*State v. Crawford,* the last of the decisions cited by the plaintiffs upon this phase of their appeal, held invalid as an infraction of due process a Washington statute which provided for a penalty of not more than $1,000 or imprisonment for not more than one year, or both, for a violation of a Washington statute which fixed five cents as the maximum streetcar fare within a municipality. In so holding, the court quoted extensively from *Ex parte Young,* supra, including the following:

"* * * Now, to impose upon a party interested the burden of obtaining a judicial decision of such a question (no prior hearing having ever been given" only upon the condition that, if unsuccessful, he must suffer imprisonment and pay fines, as provided in these acts, is, in effect, to close up all approaches to the courts, and thus prevent any hearing upon the question whether the rates

as provided by the acts are not too low, and therefore invalid. The distinction is obvious between a case where the validity of the act depends upon the existence of a fact which can be determined only after investigation of a very complicated and technical character, and the ordinary case of a statute upon a subject requiring no such investigation, and over which the jurisdiction of the legislature is complete in any event. We hold, therefore, that the provisions of the acts relating to the enforcement of the rates, either for freight or passengers, by imposing such enormous fines and possible imprisonment as a result of an unsuccessful effort to test the validity of the laws themselves, are unconstitutional on their face, without regard to the question of the insufficiency of those rates.''

The decision just reviewed is followed in 46 L.R.A. (N.S.) 1039, by an annotation which summarizes the opinions entered in several additional cases which were concerned with alleged excessiveness of statutory penalties. The reviewed opinions add nothing to the rules and discussion of which we have taken notice. The annotation says, in part:

"But penalties of from $100 to $10,000, imposed upon a railway company for failure or refusal to obey an order made by a state railroad commission, fixing reasonable rates, are, in Oregon R. & Nav. Co. v. Campbell, 173 Fed. 957, held not to be so excessive as to deny the company the equal protection of the laws. The court, commenting upon Ex parte Young, 209 U. S. 123, 52 L. Ed. 714, 13 L.R.A. (N.S.) 932, 28 Sup. Ct. Rep. 441, 14 Ann. Cas. 764, stated, that the statutes involved in that case differed so widely from the Oregon statutes involved here, in the severity of the penalties prescribed, as to render the Young Case not authoritative in this case.''

The decision in the Oregon R. & Nav. Co. case was written by the Honorable CHARLES E. WOLVERTON, who,

until his appointment to the Federal bench, was a distinguished member of this court.

Let us now determine whether or not the penalty clause can deter anyone from challenging its validity or of any charge made against him under the act.

■ The act cannot deter an owner from resorting to the courts for the maintenance of a claimed right unless it operates in such a manner that he must hazard a decision without having an opportunity to know the governing facts, and then suffer the penalty if he guessed wrong. We shall illustrate. In *Missouri Pacific Ry. Co. v. Tucker,* reviewed in a preceding paragraph, the act which the decision held invalid prescribed in terms of dollars and cents the rate which carriers could charge for transporting oil, and provided a penalty recoverable from any carrier which charged more than the prescribed rate. Since carriers were forced to accept all shipments tendered them, there was no way in which they could test the validity of the rate without disregarding it and subjecting themselves to the penalty. Of course, no carrier could know in advance of a judicial determination whether or not the legislative-prescribed rate was a lawful or unlawful one. In legal contemplation, there is a definite amount which represents a reasonable rate for transporting every item that will be tendered to a carrier, and, presumably, all other sums are too high or too low. But that definite amount, envisaged by the law, can never be known to a carrier in the absence of judicial determination. Nevertheless, the act in the Missouri Pacific Ry. Co. case compelled the carrier to abide by the legislative-prescribed rate or, if it declined to do so, run the hazard of the severe penalty if the court later sustained the rate.

In the case at bar, the owner, in computing the

amount of his tax, is not required to hazard a guess in regard to something which cannot be established without litigation. The amount of the tax is based upon two factors which the legislature deemed knowable: (a) the unit value; (b) the amount of the timber which he harvested. The unit value is endorsed upon the permit under which the owner harvested his forest crop (§ 107-124). The quantity which he harvested is shown by the reports which he, under oath, files with the forestry board and the county tax collector concurrently with making his remittance (§ 107-123). Therefore, when the owner pays his yield tax, he does not take a step in the dark, for there is in his hands the fact material which enables him to calculate accurately the required amount. He will incur no penalty (a) if his report is correct; (b) if he has made no error in the simple calculation necessary to a determination of the amount of the tax; and (c) if his remittance is for the full sum shown by the report. Such, simply stated, is the formula given by the act for the application of the penalty clause. The act has been a part of our laws since 1929 and, so far as we know, the present is the first instance in which anyone has claimed an injustice under its administration. Section 107-131 authorizes the board "to make orders, rules and regulations necessary to carry out and accomplish the purposes of this act." Seemingly, the power conferred by the provision just mentioned enables the board to authorize an owner, who, through inadvertence, failed to report the correct amount of his harvest crop, to amend his report.

Prompted by the above considerations, we deem that the principle of law employed in *Superior Laundry Co. v. Rose, Ex parte Young, Missouri Pacific Ry. Co. v. Tucker, Edwards & Browne Coal Co. v. City of*

*Sioux City*, and *State v. Crawford* has no application to the controversy before us.

In the Missouri Pacific Ry. Co. case, the court said: "It is not as if double or treble damages were allowed as often is done, and we think properly could have been done here." In the present instance, the penalty is not a fixed sum, nor do the passing days escalate its amount. The latter is not "double or treble" the amount of the tax.

There remains for consideration the application to this case of the holdings in *In re Deming's Guardianship*, supra, and *Chicago & Northwestern Ry. Co. v. Nye Schneider Fowler Co.*, supra. It will be recalled that in *In re Deming's Guardianship*, the court was impressed with the fact that the Washington legislature, in borrowing some Indiana legislation upon the subject of the guardian-ward relationship, enacted only one of the two Indiana statutes, thereby providing no penalty for a guardian who embezzled his ward's estate, but penalizing severely another guardian who was guilty of only a "comparatively minor dereliction." Moreover, since the contested act employed the word "damages", the court inferred that the legislature had in mind compensation for an injury suffered, and yet the act prescribed an arbitrary amount of ten per cent of the value of the whole estate, both real and personal. The court mentioned the fact that if the entire estate consisted of real property beyond the power of the guardian to wrong, the penalty would be the same as if it consisted of money. It found that in most instances the arbitrarily imposed penalty would be greater than any possible injury suffered by the estate.

No facts akin to those in the Deming case are present in the case at bar. This is not an instance in

which the penalty is inflicted for failure to render an accounting or to file a paper. The penalty is imposed in order to spur payment of a tax at the crucial time when the taxpayer has assets in his possession out of which the payment can be made. We referred to the time fixed by the statute for payment of the tax as being crucial. We shall now explain. Possibly the land made no contribution to the expenses of government for a score or more of years except the modest annual forest fee, and it may be that the land will not produce another forest crop until a half century or more has passed. Hence, the time specified in the statute for the payment of the yield tax is crucial. If payment at the appointed time is omitted, the state may be unable to collect the tax and will receive nothing from the land, except the forest fee, for the next half century or more.

We think that an application of the holding in the Chicago & Northwestern Ry. Co. case to the instant one would be unfavorable to the plaintiffs. It will be recalled that in that case a statute was sustained as valid which subjected a common carrier to a seven per cent penalty and to an attorney fee if it did not seasonably settle just claims within a prescribed number of days. The court held that reasonable penalties, including attorney fees, may be imposed, but that arbitrary and oppressive ones which shock the sense of fairness are prohibited by the Fourteenth Amendment.

Before reaching a conclusion, we shall consult some additional authorities. Cooley on Taxation, 4th ed., § 1273, says:

> "In tax-laws penalties are imposed for mere delinquencies, in order to hasten payment, and they

are also imposed as a punishment for frauds, evasions, and neglect of duty. * * *

"There can be no doubt of the right to impose penalties for neglect or refusal to perform duty under tax-laws where the law providing therefor gives full opportunity for a hearing; * * *.
* * *

"The legislature has power to determine the amount of the penalty, unless there is some provision in the constitution to the contrary. Such penalties are 'fines' within the constitutional provision declaring that excessive fines shall not be imposed. * * * A penalty statute should be so construed, if possible, as to prevent the penalty being an unreasonable amount."

From 51 Am. Jur., p. 848, § 970, we take the following:

"The continuance of regular and uniform receipt of the public revenue is essential to the continued existence of the state; it cannot tolerate delay in the payment of taxes, and to induce prompt payment of taxes when due, the legislatures of the several states have very generally imposed penalties upon taxpayers who fail to pay their taxes within a specified period. Such an imposition is doubtless within the constitutional power of the legislature. * * *

"* * * The object is not merely punishment of the taxpayer, but is in furtherance of public duty in the interest of public welfare, and the amount of the penalty is a matter of legislative discretion. There is nothing unconstitutional in a statute which imposes a penalty of 50 per cent for nonpayment of taxes of a certain character."

The texts from which we quoted cite many decisions in support of the quoted statements. We shall now take notice of some of them. In *Bankers Trust Co. v. Blodgett,* 260 U. S. 647, 67 L.Ed. 439, 43 S.Ct. 233,

the court sustained as valid a Connecticut statute which provided for a penalty of two per cent per annum for five years on the appraised value of any part of a decedent's property which had omitted to pay a tax in the year preceding the death. The court declared:

"* * * The payment of taxes is an obvious and insistent duty, and its sanction is usually punitive. * * *

"* * * The provision, however, is but a way of fixing a penalty for the delinquency, which it is competent for the State to do. We said in Western Union Telegraph Co. v. Indiana, 165 U. S. 304, 310, that the amount of the penalty is a matter for the legislature of a State to determine in its discretion, and in accordance with the principle we sustained a penalty of 50 per cent. of the taxes assessed against the Telegraph Company and unpaid by it. * * *

"* * * The power of taxation, with its accessorial sanctions, is a power of government, and all property is subject to it. And it is a proper exercise of it to satisfy out of his estate the delinquency of a property owner. It is so complete that it does not need the assumption of universal ownership by the State to justify it."

*Western Union Telegraph Co. v. Indiana,* 165 U. S. 304, 41 L.Ed. 725, 17 S.Ct. 345, held valid an Indiana statute which provided that on the failure of a telegraph company "to pay any tax assessed against it * * * in addition to other remedies provided by law for the collection of taxes, an action may be prosecuted in the name of the state of Indiana * * * and that judgment in said action shall include a penalty of fifty per cent of the amount of taxes so assessed and unpaid." The court said: "The amount of the

penalty was a matter for the legislature to determine in its discretion.''

*Texax Company v. Dyer,* 179 Miss. 135, 174 So. 80, was concerned with a Mississippi statute which said:

> "Every distributor or wholesale dealer of gasoline * * * failing or refusing to pay all excise taxes as provided for by law when due, shall be liable for a penalty thereon, equal to 25% of the amount of the excise tax due."

The statute rendered it the duty of distributors and wholesalers to make report of their transactions ''on or before the 15th day of each month'', and provided that remittances received in envelopes which bore post-office cancellation marks showing mailing on or before the 15th day of the month should be deemed timely. The plaintiff on the 15th day of May, 1936, secured a certified check, enclosed it with the necessary reports in an envelope addressed to the proper Mississippi official and delivered it to one of its employees with instructions to mail. The employee took it to the post-office for the purpose of registering the remittance, but, finding the registry window closed, it being after hours, did not mail it until the 16th day of May. The court held that, notwithstanding that circumstance, the plaintiff was liable for the penalty. It said:

> "The Legislature has the right, of course, to impose penalties upon taxpayers for failure to comply with the law, and to fix a date for a final payment. The penalty here imposed is not excessive when considered in connection with the purpose of government; the necessity for money to run it, and the desirability of having taxes promptly paid when due.
> * * *
> "This statute fixing the date for the payment of taxes and the imposition of penalties or damages

for failure to pay, does not violate the due process clause of the Fourteenth Amendment to the United States Constitution, * * * nor does it violate in any way, any other constitutional provision.''

In 301 U. S. 670, an appeal to the Federal Supreme Court of the case just reviewed was ''dismissed for the want of a substantial Federal question.''

*State v. Great Atlantic & Pacific Tea Co.*, 190 La. 925, 183 So. 219, had an extensive court antiquity. A Louisiana statute, the validity of which was sustained in *Great Atlantic & Pacific Tea Co. v. Grosjean*, 301 U. S. 412, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293, 302 U.S. 772, 58 S.Ct. 3, 82 L.Ed. 599, after creating a chain store license tax, provided: ''Such taxes shall bear interest at the rate of two per cent per month, plus ten per cent additional on both principal and interest as attorney's fees.'' The defendant refused to pay the tax and, on the day before which it became delinquent, instituted suit in the federal court to test the constitutionality of the act. At the conclusion of that litigation, the state began the action under review to recover the amount due under the statute in taxes, interest and attorney fees for the years 1935, 1936 and 1937 aggregating $281,536.75. The defendant thereupon deposited in the registry of the court the amount of the tax, leaving at issue only the penalty. It contended that the penalty was excessive and operated as a deterrent to judicial appeal. It depended upon the due process clause of the federal and state constitutions. In sustaining the validity of the penalty clause and in affirming the judgment of the lower court for the above-mentioned sum of money, the decision said:

''But in the case at bar, we are not confronted with such a situation. We are dealing with an act

of the Legislature over which its jurisdiction is complete. The Legislature had the authority under its broad discretionary powers of taxation to impose upon the delinquent tax debtor an interest charge of two per cent per month until paid and ten per cent additional if an attorney were employed to assist in the collection of the tax. We think that the two per cent charge, whether considered to be interest as denominated, so as to compensate for the delay in the payment of the tax, or merely a penalty, is immaterial, for in either case such charge is necessary 'in furtherance of enforcing a public duty in the interest of public welfare,' and 'when considered in connection with the purpose of government; the necessity for money to run it, and the desirability of having taxes promptly paid when due,' are neither excessive nor unreasonable, and therefore not in violation of the due process clause of the Constitution of the United States or the Constitution of the State of Louisiana. To hold otherwise would discourage the prompt payment of taxes and encourage litigation to the detriment of the fisc of the State. The delinquent tax debtor would thereby receive a decided advantage over the prompt taxpayer. Besides, to deprive the State by injunction proceedings of the use of funds to be derived from a tax while the validity thereof is being tested (as in the case at bar for a period of more than two and a half years), if intended for revenue purposes, might seriously impair the functions of the government, or if intended for the purpose of regulation, might defeat the very mischief intended to be corrected.''

Certiorari was denied in 305 U. S. 637, 59 S.Ct. 108, 83 L.Ed. 410.

■■ We deem it unnecessary to review further the authorities. It is clear that the legislature had the power to prescribe a penalty for the tardy or non-payment of the tax and that, in determining the size

of the penalty, its power was restricted only by the constitutional provisions of which we have taken notice. It is likewise clear that a penalty may be severe, for, in some instances, moderation invites disregard of the law. Although this statuts provides no criminal penalty for the nonpayment of the yield tax, we have seen from the decisions which we have reviewed that if a statute subjects its violation to both a civil penalty and a criminal prosecution, it is not invalid. Courts do not deem provision for both civil and criminal penalties as a twofold punishment of the same offense: *Bell v. State Industrial Acc. Comm.*, 157 Or. 653, 74 P.2d 55.

■ In assailing the validity of the penalty clause, the complaint states only the following as a possible basis for a belief that the penalty is excessive: "A penalty of 10 per cent of the fixed value of said products, in addition to the forest yield tax of 12½ per cent of the fixed value of said products, is an excessive penalty for the offense for which it is levied in this instance." The quoted language is completely devoid of factual material in support of the conclusion which it expresses. It is evident from the decisions which we reviewed that a penalty, in order to be void, must be grossly oppressive or disproportionate to the offense. Since the plaintiffs submit no facts in support of the conclusion expressed in the paragraph which we just quoted from their complaint, it follows that if a conclusion is warranted that the penalty is excessive, it must be based upon facts or precepts which men commonly gather in the course of their daily activities.

In determining whether or not the penalty is excessive, we may take into consideration, so we believe, the nature of the offense for which the penalty is

imposed. We think it is clear that the penalty is provided for the wrong which is done when a timber owner fails to make timely payment of the yield tax. Failure to pay the normal ad valorem tax, which is assessed against real property, is deemed a wrong, and the delinquent owner is met with large penalties, as can readily be seen from an examination of the decisions written in the many tax foreclosure cases that have been before this court in recent years. The delinquent owner who fails to make timely payment of the yield tax need not be guilty of fraud or of any other form of intentional wrong to meet with an assessment of the penalty. If his tardy payment was due to nothing more blameworthy than forgetfulness, he, nevertheless, is subject to the penalty. Evidently the legislature reasoned that a loss sustained by the public treasury through the nonpayment of the tax by a forgetful person is as costly as when any other person fails to pay his tax.

So far as we know, the statute under review, with its forest fee and yield tax in lieu of the ad valorem tax, was not preceded by similar legislation in other states. Very likely our legislature was without the help of legislative experience in other states to guide it in determining the amount of the penalty requisite to spur prompt payment of the yield tax.

The ultimate purposes of the act—to encourage reforestation and to provide continuous tax revenue—are highly important to this state's progress. Penalties are graduated in severity according to the evils which the lawmaker wishes to prevent and the exigencies with which the penalty-imposing statute deals. Nonpayment of the forest fee creates no exigency. If it is not paid timely, the forest still stands, and the normal tax lien

possibly constitutes sufficient protection against loss. But how to provide assurance against loss from non-payment of the yield tax evidently was deemed by the legislature a serious problem. A large percentage of the state's area is reforestation land and, obviously, it is expected to contribute its fair share toward the cost of government. If an owner fails to pay a yield tax which has been computed and, in the meantime, disposes of his land together with the felled timber, a real exigency will face the tax collector, for, in the past, the land paid no tax except the modest forest fee, and possibly will pay nothing except that fee for the next fifty years or more while a new stand of timber is growing. A large part of the act consists of provisions which are intended to prevent losses from occurrences of that kind. The penalty provision is one of them. Before going on, we pause to observe that the challenged penalty clause deals with a problem materially different from the evils which were intended to be thwarted by the penalty clauses under consideration in the decisions cited by the plaintiffs.

We have tried to enumerate the circumstances which determine whether or not the penalty imposed by the challenged clause is oppressive and disproportionate to the offense. Other circumstances are worthy of consideration. An ad valorem tax is based upon assessed valuations which change little in the passing years, but the yield tax is graduated to the market price of saw logs which may fluctuate much. If a removal permit is issued when the market price of logs is at low ebb, the yield tax will be lower than if removal was made at a time of high prices. If a fire destroyed the forest crop before a removal permit was issued, no yield tax is possible. Thus, in place of the stability of return which is a feature of ad valorem taxes, this new type

of tax legislation projects the state, to a substantial extent, in a speculative venture.

In its efforts to minimize the possibility that the yield tax will not be paid, the legislature adopted some provisions which we have not so far developed and which have an indirect bearing upon the matter of a penalty: (1) Section 107-124, O.C.L.A., enables the forestry board, before issuing a removal permit to an owner of doubtful worth, to exact of him a bond assuring the state "against any loss of yield tax revenue"; it is plain, however, that the legislature regarded the timber itself as the state's best assurance that the tax would be paid; (2) unlike the ad valorem tax, the yield tax must be paid semi-annually (January 15 and July 15) upon the total operation conducted up to January 1 and July 1; (3) the combined yield tax and penalty constitute "a first lien against the said forest crops"; (4) the combined sum is a personal debt of the owner and, in order to facilitate its collection, the county, as tax collector, is afforded all available remedies including the "provisional remedies" freed from the conditions imposed upon private litigants.

The care which the legislature exercised in trying to assure prompt payment of the yield tax shows that it deemed the tax an important source of the public revenue.

The foregoing completes our analysis of the act and of the authorities which bear upon the validity of the penal provision. Our examination of the act and of its purposes has revealed nothing whatever in the nature of a fact which shows that the penalty provision is oppressive or disproportionate to the evil which the act seeks to prevent. The act, in order to minimize for the owners of reforestation lands their tax burden, releases them from a part of it until their lands present

them with a yield, and even then does not exact payment until 15 days after each six-months harvest has been garnered. The very manner in which the act operates acquits the legislature of any thought that it intended to deal with land owners in any manner except fairly. It is seen from the foregoing that the penalty provision does not become operative until the owner has received fair, if not favored, treatment. It becomes operative at a critical hour, and its sole purpose is to prevent the state from losing tax money. No court, in the absence of cogent reasons, should interfere with the financial policies of the state as pronounced by the legislature. A very careful analysis of the act, of its commendable purposes and of the crucial situation under which the challenged penalty is imposed has not persuaded us that the penalty clause is oppressive or disproportionate to the evil of nonpayment which it is intended to prevent. We reject the contention that the clause is invalid.

Next, the plaintiffs contend: "The courts have power to, and do, waive or remit tax penalties in meritorious cases." The plaintiffs cite no part of the act which authorizes courts to waive or remit any penalty imposed under this act, and our reading of the latter has disclosed no provision of that kind. In support of their contention, the plaintiffs cite *General Petroleum Corp. v. Smith,* 62 Ariz. 239, 157 P.2d 356, 158 A.L.R. 364; *People v. Texas Co.,* 85 Colo. 289, 275 P. 896; and *State v. Chicago & N. W. Ry. Co.,* 128 Wis. 449, 108 N. W. 594.

In *Rainey v. Quigley,* 180 Or. 554, 178 P.2d 148, this court said:

> "Courts of equity have long recognized a distinction between forfeitures agreed upon by the parties and those provided by statute. Equity may relieve from the former, but not from the latter."

After an exhaustive review of the authorities, the decision continued:

> "As far as the reason of the thing goes, we have seen no adequate answer to the proposition that a court of equity may not defeat the legislative will upon the ground that the law is harsh and severe in its character."

We take the following from 19 Am. Jur., Equity, p. 107, § 99:

> "A court of equity will not interpose to mitigate or grant relief from a penalty or forfeiture which is imposed by statute in the event of the doing of, or omission to do, a specified act. While the aid of the court may be invoked in a case which is concerned with the consequences of a breach of contract, a case which involves a noncompliance with statute stands upon a different footing. The statute is an expression of the will of the legislature; the forfeiture or penalty which is imposed thereby may not be set aside by a court of equity with greater propriety than it may by a court of law.
>
> "* * * Likewise, in the enforcement of the United States revenue acts, it may happen that hardship and injustice will at times be occasioned to those who inadvertently violate such statutory provisions and incur the penalties and forfeitures for which they provide. A court of equity has, nevertheless, no right to interfere and virtually to repeal the express provisions thereof by defeating the operation of such acts in a particular case."

In *State v. Chicago & N. W. Ry. Co.*, supra, one of the authorities cited by the plaintiffs, it is said:

> "We venture the assertion that no authority can be found nor principle referred to sustaining the proposition that a statutory penalty for failure to pay an ordinary tax can be avoided on the ground of mistake or discharged otherwise than by full payment."

When we reviewed the section of the act in question which imposes the penalty (107-125), we noticed that the section terms the penalty "an additional yield tax of 10 per cent." We deem that fact important. The entire expression is "a penalty of an additional yield tax of 10 percent of the fixed value of said products". Thus, delinquency increases the amount of the yield tax, and the accretion to the tax, upon delinquency, is the circumstance upon which the legislature seized to spur tax payment.

We return to *State v. Chicago & N. W. Ry. Co.,* supra, and quote from it the following:

> "As soon as the default occurred the penalty would be regarded in legal effect as part of the tax, especially since the law provides for an absolute forfeiture. * * * It is said, in effect, in Cooley on Taxation, 900, that a penalty for neglect to pay a tax constitutes an addition to the tax. Judicial authorities so hold."

The statute before us certainly contains no provision which authorizes any court to remit any part of a tax which it imposes.

■ We do not believe that the courts of this state have power to grant relief from a statutory penalty. We dismiss this contention as lacking in merit.

Finally, the plaintiffs argue:

> "The penalty provision should be so construed as not to apply to those who do not willfully fail to pay their yield taxes 'within said 15-day period', in order to avoid an unconstitutional construction of the act and an inequitable result."

The plaintiffs submit, in support of that contention, seven decisions entered in other cases, including the following four rendered by this court: *Corbett Investment Co. v. State Tax Comm.,* 181 Or. 244, 181 P.2d

130; *Allen v. Multnomah County*, 179 Or. 548, 173 P.2d 475; *Nanny v. Oregon Liquor Control Comm.*, 179 Or. 274, 171 P.2d 360; and *Fox v. Galloway*, 174 Or 339, 148 P.2d 922.

The facts in all of the seven decisions upon which the plaintiffs depend are so different from those before us that nothing would be gained by setting forth a review of them in this opinion. The principles of statutory construction which they employed are well known. The fundamental rule to which we must give heed is given in § 2-216, O.C.L.A.; it states:

"In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all."

█ The plaintiffs do not claim that the penalty clause is couched in ambiguous language, and we deem that its meaning is as clear and lucid as can be expressed in the English language. Generally, courts are forbidden to resort to the rules of construction unless they encounter an ambiguity.

We do not believe that we have any authority whatever to infiltrate into the penalty clause the words which must be infused into it for the plaintiffs to prevail. Since the meaning of that clause is clear, we must accept it as it is. As was said in *State v. Chicago & N. W. Ry. Co.*, supra: "That seems exceedingly harsh, but if the legislature intended to be that harsh and did not exceed constitutional limitations in that regard, the court has no right to invade its domain by judicially, so to speak, amending the law."

We think that the circuit court correctly construed the act and that its declaratory judgment is free from error.

AFFIRMED.

BRAND, C. J., specially concurring.

I concur in the result but believe that the majority opinion goes beyond the issue which is properly before us and that it announces a rule concerning the correctness of which I have serious doubts and which rule, even if correct, is not applicable here. The issue in the case at bar is a simple one. The statute imposes a penalty upon any person harvesting forest crops from lands which have been classified as reforestation lands who "shall have failed to make his remittance of yield taxes due hereunder within said 15-day period." The plaintiffs failed to make their remittance within the statutory period. They were about two months late. There was no other failure on the part of the plaintiffs in the performance of their statutory duties. There is no dispute as to the "number and kinds of units of all forest products harvested." The number of board feet of fir saw logs, and the unit value "as determined by the State Board of Forestry" and the total value of the timber harvested are all alleged in the complaint, and, for the purposes of this case, admitted by the demurrer. It is clear that the prompt payment of sums due before the timber has lost its identity by manufacture or been sold to innocent parties is a matter of great importance if the state is not to lose its remedies for enforcement of the tax. The statutory penalty is a severe one but it is imposed as a strong inducement to insure payment within the time required. The imposition of a penalty for nonpayment of taxes or for delay in payment is a common and approved device universally

employed to facilitate the collection of the public revenues. While the penalty in this case approaches the verge of arbitrary excessiveness, I nevertheless agree with the majority that, as applied in this case on the issues here presented, we should hold the law constitutional. The majority opinion goes on to consider whether the penalty provision would be equally valid if applied to other persons under circumstances wholly different from the simple facts of the pending case. The question which is, I think, unnecessarily discussed, is "whether or not the penalty clause can deter anyone from challenging its validity or any charge made against him under the act." More specifically stated, the question discussed is whether or not the owner who harvests the crop would be liable for the penalty if he failed to remit the proper amount of yield taxes "due" under the requirement that the report to the tax collector "shall be accompanied by the owner's remittance * * * of the yield tax due hereunder." OCLA, § 107-123. The conclusion of the majority appears to be that the penalty provision cannot deter an owner from resorting to the courts because the facts which determine the amount due are knowable. "He is not required to hazard a guess in regard to something which cannot be established without litigation." As stated, the amount due is determined by two factors; the unit values of the various kinds of units harvested and the amount of each kind which was harvested. The unit market values are as determined by the State Board of Forestry "from all evidence it commands." OCLA, § 107-124. If the owner "to whom such permit is issued" shall feel aggrieved he may have a hearing and thereafter an appeal to the courts as to the true unit values, giving bond to indemnify the board and the tax col-

lecting officers. OCLA, § 107-124. He may then proceed to harvest the product. It is inaccurate, however, to refer to the product as "timber". The statute refers broadly to "forest crops harvested" and thus includes various kinds of product; the tree species, such as hemlock, pine, second-growth Douglas fir, etc., and the type of product such as cordwood, piling, saw logs, etc. Disregarding the possibility that after an appeal has been taken and a bond given and after the crop has been harvested, the trial court might hold that the unit values were greater than those set forth in the required report of the owner, with the ensuing possibility of the imposition of a penalty, there is a possibility, and judicial experience would indicate a probability, of many honest and reasonable disagreements as to the scale and proper classification of the products harvested. What timber harvested was merchantable; what was properly listed as a pole, a pile, or a second-growth log; how many board feet of merchantable timber were included in a given log in view of its condition; was the scale accurate? It should be remarked that the commercial procedure of log scaling is not an exact science. The result is determined by measurement plus estimate by expert scalers. If an owner should, in good faith, file a report under oath in which he had erroneously stated the "number and kinds of units of all forest products harvested", and if the board should ultimately prevail in establishing that a somewhat greater sum should have been tendered as tax, a most serious question would arise as to the owner's liability for the penalty. On such an issue it would be the duty of a court first to construe the act to determine if it was the legislative intent that the penalty should be incurred in such case and if, following the literal words of the

statute, it should be held that the penalty was imposed, a question of constitutionality would arise. It may well be that in the event of a dispute between the owner and the board or the tax collector as to the exact amount due, the owner would yield to the claim of the board or tax collector and pay the amount demanded rather than litigate the issue with the knowledge that he would be subjected to a severe penalty if the court should find that his remittance was too small. Again, if the remittance was too small to any extent, and if the owner acted in good faith, the question would necessarily arise as to whether the penalty specified was not grossly disproportionate to the offense penalized. I have no disposition to argue these hypothetical issues. The cases cited in the majority opinion, and many others which might be cited, indicate that under some circumstances penalties may be held invalid because excessive and disproportionate, especially if they tend to deter a party from appeal to the courts for a determination of his rights.

There is eminent authority which indicates that we should limit our inquiry to the constitutionality of the act as applied to the specific facts of the pending case.

> "One of the elementary doctrines of constitutional law, firmly established by the authorities, is that the constitutionality of a legislative act is open to attack only by a person whose rights are affected thereby. Before a law can be assailed by any person on the ground that it is unconstitutional, he must show that he has an interest in the question in that the enforcement of the law would be an infringement on his rights. * * *" 11 Am Jur 748, Constitutional Law, § 111.
> "A person who is seeking to raise the question as to the validity of a discriminatory statute has no standing for that purpose unless he belongs to

the class which is prejudiced by the statute. * * *
11 Am Jur 759, Constitutional Law, § 114.

In *Yazoo & M. V. R. Co. v. Jackson Vinegar Co.*,
226 US 217, 57 L ed 193, plaintiff brought an action
to recover damages for the partial loss of a shipment
of vinegar. Plaintiff recovered judgment for actual
damages and $25 as a penalty. A statute provided that
a common carrier failing to settle claims for damaged
freight as therein required should be subject to the
penalty. On appeal to the United States Supreme
Court the carrier challenged the act as unconstitutional. The court said:

"As applied to such a case, we think the statute
is not repugnant to either the due process of law
or the equal protection clause of the Constitution,
but, on the contrary, merely provides a reasonable
incentive for the prompt settlement, without suit,
of just demands of a class admitting of special
legislative treatment. See Seaboard Air Line R.
Co. v. Seegers, 207 U. S. 73, 52 L. ed. 108, 28 Sup.
Ct. Rep. 28; St. Louis, I. M. &. S. R. Co. v. Wynne,
224 U. S. 354, 56 L. ed. 799, 42 L. R. A. (N. S.)
102, 32 Sup. Ct. Rep. 493.

"Although seemingly conceding thus much,
counsel for the railway company urge that the
statute is not confined to cases like the present, but
equally penalizes the failure to accede to an excessive or extravagant claim; in other words, that it
contemplates the assessment of the penalty in every
case where the claim presented is not settled within
the time allotted, regardless of whether, or how
much, the recovery falls short of the amount
claimed. But it is not open to the railway company
to complain on that score. It has not been penalized
for failing to accede to an excessive or extravagant
claim, but for failing to make reasonably prompt
settlement of a claim which, upon due inquiry, has
been pronounced just in every respect. Of course,
the argument to sustain the contention is that, if

the statute embraces cases such as are supposed, it is void as to them, and, if so. void, is void *in toto*. But this court must deal with the case in hand, and not with imaginary ones. It suffices, therefore, to hold that, as applied to cases like the present, the statute is valid. * * *"

In *Aikins v. Kingsbury,* 247 US 484, 62 L ed 1226, the court said:

"* * * He who would successfully assail a law as unconstitutional must come showing that the feature of the act complained of operates to deprive him of some constitutional right. * * *"

See also: *McKinney v. Watson,* 74 Or 220, 145 P 266; *Mulkey v. Bennett,* 95 Or 70, 186 P 1115; *Briedwell v. Henderson,* 99 Or 506, 195 P 575; *Red Hawk v. Joines,* 129 Or 620, 278 P 572.

In the light of the rule established in the cases cited, I think we should apply the doctrine of separability of application and pass upon the constitutionality of the act only as it applies to the case presented in the record.

Mr. Justice LUSK joins in this opinion.